226 So.2d 185 (1969)
Theodore L. TANNEHILL, Jr., Plaintiff-Appellant,
v.
Estelle Scott Southerland TANNEHILL et al., Defendant-Appellees.
No. 2813.
Court of Appeal of Louisiana, Third Circuit.
August 26, 1969.
Rehearing Denied September 16, 1969.
*186 Provosty, Sadler & Scott, by Richard B. Wilkins, Jr., Alexandria, for plaintiff-appellant.
Holt, Wagner & Lee, by Richard E. Lee, Pineville, for defendants-appellees.
En Banc.
TATE, Judge.
The plaintiff husband sues to annul a marriage contracted between him and the defendant wife, as well as to disavow a child born after the marriage. Made defendants are his wife and the child. The plaintiff appeals from the dismissal of his suit upon the defendants' exception of no cause of action.
The plaintiff Theodore Tannehill and the defendant Estelle Scott were participants in a marriage ceremony on April 28, 1966. In 1969, three years later, a child was born of Estelle and named Scott Tannehill.
Founded upon appropriate allegations stating separate causes of action, the prayer of the plaintiff Theodore's petition makes three principal demands: (1) that the court decree to be an absolute nullity a 1965 judgment allegedly divorcing his wife Estelle from her prior husband; (2) that, as a consequence, the court also decree invalid and null the subsequent 1966 marriage of the (undivorced) Estelle and himself, Theodore; and (3) that, for reasons to be specified below, the court decree that Theodore is not the father of the child Scott.
The plaintiff Theodore contends that the trial court erred in dismissing his suit upon the face of the pleadings. He points out, correctly, that an exception of no cause of action should not be sustained as to a demand if evidence admissible under the pleadings could justify judgment in favor of the petitioner, construing the petition most favorably to him.

I.
As ground for annulling Estelle's 1965 divorce, Theodore alleges that she and her former husband obtained it in LaSalle Parish, although they were domiciled in Winn Parish.
*187 Under LSA-CCP Art. 3941, an action for a divorce must be brought in the parish of domicile or of last matrimonial domicile. The article further provides that a judgment obtained in a court of improper venue is "an absolute nullity."[1]
The redactors expressly note that the article codified the jurisprudential rule that, for reasons of public policy, courts other than those specified have no jurisdiction to render a valid divorce decree. Official Revision Comment (f). This being so, the LaSalle decree is, under the allegations of the petition, an absolute nullity.
The appellee Estelle relies, however, upon the strong jurisprudential rule preventing collateral attacks upon divorce decrees. Wilson v. Calvin, 221 La. 451, 59 So.2d 451. We ourselves believe, for the reasons stated by Wilson, that to permit collateral attacks such as the present is unwise and could create much mischief, and that it may well have not been contemplated by the redactors of the 1960 Code of Civil Procedure.
Nevertheless, in view of the express code provision, we are bound to consider the present demand for annulment of the divorce judgment as stating a cause of action to attack it as void on jurisdictional ground. The Wilson ruling expressly bars collateral attacks only on "errors or irregularities not jurisdictional." 59 So.2d 453.
Since (under the allegations) the divorce judgment is an absolute nullity for jurisdictional reasons, it has no legal existence. Walworth v. Stevenson, 24 La.Ann. 251 (1872). Thus, a person with interest may show such nullity in collateral proceedings at any time and before any court, for absolutely void judgments are not subject to the venue and delay requirements of the action of nullity (now LSA-CCP Arts. 2001-2006). Tracy v. Dufrene, 240 La. 232, 121 So.2d 843; Buillard v. Davis, 185 La. 255, 169 So. 78; Decuir v. Decuir, 105 La. 481, 29 So. 932.[2]
We therefore, with some hesitance as to the correctness of our view, find that a cause of action has been stated to annul the divorce judgment as jurisdictionally void.[3]
If the only demand at issue were to annul the divorce, it might be contended that as a direct attack upon the judgment the suit could be brought only in LaSalle Parish, since the non-waivable venue of actions of nullity is in the court which rendered the judgment attacked. LSA-CCP Arts. 44, 2006. This jurisdictional defect can be noticed by the appellate court of its own motion. Succession of Guitar, La.App. 4th Cir., 197 So.2d 921. However, here the demand to annul the divorce judgment is ancillary to the demand to annul the marriage (see II below), and thus this collateral attack may be brought before *188 another court in which the principal claim for relief is asserted. Tracy v. Dufrene, 240 La. 932, 121 So.2d 843.

II.
The husband Theodore also sues to annul his 1966 marriage to his wife Estelle on the contention that her 1965 divorce was an absolute nullity. For the reasons stated in I above, he can collaterally attack this divorce decree in the present suit. We note that it was brought in Rapides Parish, Estelle's alleged domicile, and thus the marriage-annulment action is properly venued as unwaivably required by LSA-CCP Art. 3941.
Various issues are briefed as to whether this might be a putative marriage even if the divorce is technically invalid, as to whether (if so) the child thus has the status of a legitimate child, and as to whether the plaintiff has the right to amend to more clearly specify the particulars of the invalidity of the marriage even as putative. We need not decide them here, for the question before us is, simply, whether the plaintiff has stated a cause of action to annul his marriage to Estelle.
We hold he has, and remand. The consequences of a determination upon the merits concerning the invalidity of the marriage or of its possible putative effects are not before us now.

III.
The third cause of action pleaded, as the foundation of the plaintiff Theodore's third demand, is to disavow the child under the provisions of Civil Code Articles 184-192. The two substantial grounds asserted are: (1) that Theodore could not be the father of the child, since he is sterile because of a childhood disease and is thus biologically incapable of producing spermatozoa to conceive a child; and (2) that Theodore is not the father of the child, nor even presumed to be so, because his marriage to Estelle was void.
Historically, as we will note, the action of disavowal in Louisiana has been restricted to Code-specified grounds. Neither of the grounds alleged is a Code cause for disavowal, and hence the trial court properly sustained an exception of no cause of action as to the demand to disavow the child.
Our Civil Code lists only five grounds for disavowal, none of which include the sterility of the husband nor the invalidity of the marriage. Articles 185-190. Uniform judicial interpretations have indicated that these five grounds, and these five grounds only, are cause for disavowal. Williams v. Williams, 230 La. 1, 87 So.2d 707; Lambert v. Lambert, La.App.3d Cir., 164 So.2d 661. See Comment, Action en Desavue, 23 La.L.Rev. 759 (1963).
With regard to the persuasive practical arguments for permitting disavowal by a sterile husband:
In Williams v. Williams, cited above, our Supreme Court rejected an attempt to disavow a child on the basis of blood tests which allegedly conclusively showed the husband could not be the father of the child, holding this was not one of the Code-authorized grounds. This court cannot, consistently with the Williams holding, permit the present child to be disavowed by reason of scientific tests which allegedly can prove the present husband cannot have fathered the present child.
Furthermore, despite any technical difference between the "impotence" or the "sterility" of the husband, we see no true functional reason why the Code should prohibit disavowal for impotence and permit it for sterility, even without taking into consideration the state of scientific knowledge at the time the Code provision was first enacted. To the contrary, the Code's emphasis that a child cannot be disavowed *189 even for impotence indicates a statutory concern that the causes for disavowal be limited to those specified by statute.
The general statutory intent, as consistently interpreted by the Louisiana courts, is to protect helpless children born during a marriage from illegitimation by one or both of their parents or by others for their own selfish aims. Williams v. Williams, 230 La. 1, 87 So.2d 707, 709 (syllabus 7). This, until now, has been the guiding principle of restrictive judicial interpretation of these Code provisions.
The rigid construction of the paternity and disavowal articles by the Louisiana courts has been criticized by some scholars, notably Professor Robert A. Pascal. See, for instance, his commentaries at 14 La. L.Rev. 121 (1953), 17 La.L.Rev. 310 (1957), 18 La.L.Rev. 685 (1958), 25 La.L.Rev. 297 (1965), and 26 La.L.Rev. 461 (1966).[4] Nevertheless, the Louisiana courts have consistently so interpreted and applied them, despite commentaries indicating different interpretations by the French courts of the French counterpart articles. We are unwilling to depart from this settled guiding principle, in the absence of direction from our Supreme Court to the contrary.
Before concluding, we should note the skillful effort by the plaintiff-appellant's counsel to avoid the application of this jurisprudence by alleging that the plaintiff Theodore could not be the father of the child, since the marriage between himself and the child's mother was void. Thus, he alleges, the ordinary presumption that husband is the father of children conceived during the marriage, LSA-Civil Code Article 184, does not apply, since Theodore is not the husband of the child's mother.
If Theodore is not the husband of the child's mother, then the disavowal articles do not apply; for they regulate only actions to disavow legitimacy resulting from marriage. He thus asserts no cause of action under these articles. Our dismissal of his action to disavow under these articles does not, of course, prevent him from obtaining any relief which might result should he be successful in annulling the marriage, but these consequences result from principles of law other than those expressed by the disavowal articles.

Decree.
Normally, a suit will not be dismissed upon an exception of no cause of action if the allegations set forth a cause of action as to any part of the plaintiff's demand. Bailey v. Texas Pacific Coal and Oil Company, 134 So.2d 339 (La.App.3d Cir., 1961). As the Bailey case indicates, the exception should thus normally be overruled if any part of the petition can stand against the exception.
On the other hand, when two separate and distinct demands are set out by the petition, an exception of no cause of action may lie to eliminate one, but be overruled as to the other. Succession of Nelson, 163 La. 458, 112 So. 298 (1927); Succession of Curtis, 156 La. 243, 100 So. 412 (1924); City of Natchitoches v. State of Louisiana, La.App.3d Cir., 221 So.2d 534. Dean McMahon has discussed this subsidiary rule and the reason for it, *190 distinguishing it from the usual rule that the exception should be overruled if not available as to part (of a demand) of the petition. McMahon, The Exception of No cause of Action, 9 Tul.L.Rev. 17, 31-32 (1934). See also McMahon, Work of the Louisiana Appellate Courts, 23 La.L.Rev. 385-86 (1963).
Accordingly, (1) we overrule the defendants' exception of no cause of action to the plaintiff's cause of action alleged to annul the 1965 divorce and the 1966 marriage, and we reverse the trial court's holdings to the contrary and remand this case for further proceedings consistent with the views here expressed; and (2) we affirm the trial court judgment, insofar as it dismissed the plaintiff's demand to disavow the child. The costs of this appeal are to be paid one-half by the plaintiff-appellant, one-half by the defendants-appellees; all other costs are to await final disposition of these proceedings.
Affirmed in part; reversed in part.
FRUGE and MILLER, Judges (dissenting).
Although a majority of my brethren have decided that this case is to be remanded to the trial court for determination on the merits, their opinion specifically affirms the ruling of the trial court as to the issue of disavowal. It is on this single issue that we respectfully dissent.
As a separate cause of action, plaintiff alleged in his petition that by reason of a childhood disease he has been rendered physically and biologically sterile, therefore making it an impossibility that he could have fathered the defendant's child. In our opinion this case presents a res nova question giving us a perfect opportunity for the long-overdue confrontation with the interpretation of certain articles of our Civil Code, namely, Articles 184 through 197.
At the onset, we stress that this case does not involve the merits, but rather seeks to answer only the question of whether plaintiff should have his day in court to attempt to prove the causes alleged in his petition. Logic and common sense seem to demand that plaintiff, at the very least, be given that opportunity.
In discussing the issue at hand, we seek to rebut the conclusions of the majority in answering the following questions: 1) Are the provisions of the Civil Code exclusive as to methods of disavowal or merely illustrative? 2) Is there a difference between "impotency" as that term is used in Article 185, and "sterility" so that the latter could constitute a valid ground for disavowal? 3) Has plaintiff alleged sufficient facts to warrant an overruling of the no cause of action exception on this ground?
1. Articles 184-192.
In its opinion the majority makes the statement that the action of disavowal in Louisiana has been restricted to Code-specified grounds. In the opinion it is stated:
"Our Civil Code lists only five grounds for disavowal, none of which include the sterility of the husband * * * Articles 185-190. Uniform judicial interpretations have indicated that these five grounds, and these five grounds only, are cause for disavowal." (Emphasis supplied.)
The cases of Williams v. Williams, 230 La. 1, 87 So.2d 707 (1956), Lambert v. Lambert, 164 So.2d 661 (La.App. 3d Cir., 1964), and the Comment, "Action en Desaveu.", 23 La.Law Review, 759 (1963), are cited to support this statement of the law.
A reading of these authorities does not lead to this conclusion. In the Williams case, supra, we note only the language of our Supreme Court stating that the provisions *191 of the Civil Code on the subject are very rigid and as stated in the case of Dejol v. Johnson, 12 La.Ann. 853, the legal presumption (of Article 184) "can only be rebutted in the mode and within the time prescribed by law * * *" Here, it is our opinion that plaintiff alleges a method allowed by law, and a cause commenced within the time prescribed.
In the case of Lambert v. Lambert, supra, a case of this circuit, the only authority cited for the proposition that the Code provides only five grounds for an action en desaveu, are the Williams case, supra, and the comment in 23 La.Law Review 759. That very comment, as quoted in the opinion, states only that "the Louisiana Civil Code has been thought to provide five separate grounds for an action en desaveu * * *" (Emphasis supplied.)
In addition to a lack of authority stating that there are "only five grounds for disavowal", this writer notes that the Codal articles themselves do not suggest that they attempt to announce those methods, and those methods only, by which a husband can contest the legitimacy of a child. With the exception of a child born before the 180th day after the marriage, or 300 days after the dissolution of a marriage or after a separation, or in the case of "remoteness", the articles are written in the negative as to how illegitimacy may be proven. To say that the redactors of the Code meant to establish in these short paragraphs the only methods by which the legitimacy of a child could be contested, we believe, is to do injustice to the intelligence of those men who were the writers of a Code on which the majority of our law is based.
There being a lack of applicable jurisprudence on the subject, we conclude that the Codal provisions noted are merely illustrative of the methods by which an action en desaveu can be brought and do not exclude other reasonable, logical and provable methods.
2. "Impotency" versus "Sterility".
In its opinion the majority states:
"Furthermore, despite any technical difference between the `impotence' or the `sterility' of the husband, we see no true functional reason why the Code should prohibit disavowal for impotence and permit it for sterility, even without taking into consideration the state of scientific knowledge at the time the Code provision was first enacted." (Emphasis supplied.)
Very simply stated, there is a "world" of difference from any standpointbiological, physical, or logicalbetween the meaning of the terms "impotence" and "sterility". The vast difference between the two terms is as "functional" a reason why the Code should be interpreted to prohibit disavowal for impotence and yet permit it for sterility, as a reason could be.
It is not questioned that the provisions of our Civil Code deny to a husband an action to disavow on the grounds of his impotency. The words of Article 185 express that idea without restraint. The question before us here, however, was not whether plaintiff can disavow on the grounds of his "impotency", but rather can he, by proof of "sterility", use this as a grounds for disavowal. The answer things on the difference in the meaning of the two terms.
In the briefs of defendant, and evidently in the minds of the majority, it was alleged that the two terms are synonymous. Our research, on the other hand, leads to a much different conclusion.
In Schmidt's Attorney's Dictionary of Medicine, (1968), the word "sterility" is defined as:
"1. In the male, the condition of being unable to fertilize successfully the female reproductive cell (ovum); the inability to beget offspring; the inability to impregnate." *192 On the other hand, the same work defined "impotency" or "impotence" as:
"The lack of power, on the part of the man, to perform the sexual act. The lack of power lies in the inability to maintain an erected penis and to culminate the act with an ejaculation of semen."
In the work entitled Traumatic Medicine and Surgery for the Attorney, Volume 5, page 519, we note the following definitions:

"Impotence is the inability of the male to effect the complete sexual act. This disability may be partial or total. Potency comprises normal, adequate erection maintained for a reasonable period, emission, orgasm, and ejaculation * * *"

"Fertility means the ability to ejaculate semen containing sperm in normal number and quality. A man may be potent but infertile, fertile yet impotent." (Emphasis supplied.)
In the way of legal publications, the work C.J.S., Volume 42, at page 410, defines "impotency" as follows:
"Want of power for copulation; and the absence of complete power of copulation is an essential element to constitute impotency. It may be curable, incurable, accidental, or temporary. Specifically, the irremediable physical incapacity for any reasonable sexual connection; the state of permanent inability on the part of one of the parties to perform the complete act of sexual intercourse. The term `impotency', however, may be applied to other than sexual powers. The term has been held synonymous with `incapacity for copulation, or sexual intercourse.' It has been distinguished from `barrenness', * * * `corporal imbecility' * * * `incapacity for, or lack of power of procreation,' and `sterility'. * * *" (Emphasis supplied.)
At Volume 82 C.J.S. page 1067, the word "sterility" is defined in that work as follows:
"Quality or condition of being sterile. The term has been distinguished from `impotency' see 42 C.J.S. p. 410 note 90." (Emphasis supplied.)
Although we find no Louisiana cases defining either term, there is out-of-state jurisprudence. In the New Jersey case of Donati v. Church, 13 N.J.Super. 454, 80 A.2d 633, the court stated "[i]mpotence is not sterility or inability to beget or bear a child, it is inability to have sexual intercourse." (Emphasis supplied.) See also, Cott v. Cott, 98 So.2d 379, 65 A.L.R.2d 774 (Fla.App., 1957); Smith v. Smith, 206 Mo.App. 646, 229 S.W. 398 (1921); Peter v. Peter, 208 Pa.Super. 221, 222 A.2d 511 (1966); Wilson v. Wilson, 126 Pa.Super. 423, 191 A. 666 (1937).
In view of the above, we dissent from the finding that there is no "true functional reason" why the Code should prohibit impotency and permit sterility as a grounds for disavowal. A man can be naturally and unquestionably impotent, yet fully capable of fathering a child. If he is sterile, however, he can not procreate. Impotency concerns the ability to have sexual intercourse, and that is its only concern. Sterility does not concern itself with the act of intercourse, but rather with the functions of the sex organs to produce sperm capable of impregnating the female reproductive cell (ovum).
Since it is without question that there is a possibility that an impotent male can father a child, the redactors of the Code were eminently correct in prohibiting the use of evidence of that condition as a grounds for disavowal. A court in this modern day and age cannot close its eyes, however, to the fact that there are such practices as artificial insemination occurring without normal sexual intercourse, and thus completely alleviating the handicap of *193 impotency. As well the condition of impotency is far less prone to medical proof than that of sterility.
In view of the above, the writers of the Code were forced to close the door to impotence as a cause for disavowal. Yet this restriction does not cover the condition of sterility, where it is impossible for the husband to procreate.
Sterility is a condition which, if established, renders it impossible to procreate and it is clear that the husband who is sterile during the period of conception cannot become a father.
There being a vast difference between the meaning of the two terms, we believe that this difference cannot be allowed to go unrecognized.
The opinion of the majority relies heavily on "[t]he general statutory intent * * to protect helpless children born during a marriage from illegitimation by one or both of their parents or by others for their own selfish aims."
Although the jurisprudence, the legislative intent, and the opinion of the majority reveal unquestionably their meritorious social concern for the welfare of the young, they seem to set aside completely any rights an adult accused of fathering a child he could not father, and held to responsibilities and obligations which by law should not be his, has in seeking to protect himself.
As was stated by Professor Robert A. Pascal in his Comment in 18 La.Law Review 685 (1958), at p. 689,
"The rules of law should presume legitimacy where there is a reasonable and indissolvable doubt as to whether the husband is the father; but there is no need to impose paternity and all its obligations on a man whose non-paternity can be demonstrated beyond any reasonable doubt."
The above is especially true in the case at hand, and in view of the fact that, as admitted by the majority in its opinion, there is not the slightest doubt but that this case is absolutely free of any default or collusion on the part of the parties. If such were present, then the caution exercised by the majority would be understandable, but where as here there is no such fear, the issue should be squarely and justly decided with the rights of all parties properly protected.
Professor Pascal stated it well at 14 La. Law Review 125,6:
"* * * Articles 184-192 do establish a presumption of legitimacy where indications of irregularity in the conception of the child were absent, but there is nothing in the articles to imply that we must shut our eyes to the obvious immorality of life in our times to such an extent as both to impose unjustly on a man the status and obligations of legitimate paternity, with all they imply in terms of alimony and succession, and to add insult to injury by stamping him officially with the mark of the cuckold. This cannot but produce a feeling of contempt for both legislation and the administration of justice."
3. The Exception.
By this dissent we do not mean to say that plaintiff can prove his sterility, but only that he should be given the right to his day in court to attempt to prove this condition.
As was noted by our Supreme Court in the case of State ex rel. Womack v. Jones, 201 La. 637, 10 So.2d 213 (1942):
"The function of the courts of justice is to interpret the laws so as to give them the meaning which the lawmakers obviously intended them to have and not to construe them so rigidly as to give them absurd or ridiculous meanings."
*194 If in fact the plaintiff has the ability to prove his complete sterility and thus his inability to procreate, a decision denying him that right, even for the purpose of seeking cautious protection for the status of a young child, would in fact constitute an "absurd" or "ridiculous" interpretation of our Civil Code.
For the foregoing reasons, we are of the opinion that the petition of plaintiff does in fact state a cause of action for disavowal, and that the judgment of the trial court denying him that cause should be reversed.

On Application for Rehearing.
En Banc. Rehearing denied.
FRUGE and MILLER, JJ., vote for rehearing.
NOTES
[1] This is one of the "jurisdictional" venues which may not be waived by the parties. LSA-CCP Art. 44. See 28 La. L.Rev. 392-93 (1968).
[2] The divorce proceedings may or may not show on their face the jurisdictional defect. Under the allegations of the petition most favorably to the petitioner, these proceedings could show without extrinsic evidence the jurisdictional defect complained of. We therefore do not reach the question of whether the lack of jurisdictional venue could be shown by extrinsic evidence other than in a direct attack by action of nullity upon the judgment, venued as required by LSA-CCP Art. 2006. Cf., Wilson v. King, 227 La. 546, 79 So.2d 877, Edwards v. Whited, 29 La.Ann. 647, Restatement of Judgments, Sections 11 and 12 (1942). See James, Civil Procedure, Section 11.6 (1965). But see 49 C.J.S. Judgments §§ 421, 426 (1947).
[3] In the action to annul his divorce, Estelle's former husband would appear to be an indispensable party, LSA-CCP Art. 641, which may be noticed by the court upon its own motion, LSA-CCP Art. 645. However, his absence may be remedied by amendment upon the remand, LSA-CCP Arts. 646, 934.
[4] The writer himself has criticized the mechanical application of the paternity presumption, when used to deprive a child or his true parents of their rights, instead of to protect the child. See his dissent in George v. Bertrand, La.App.3d Cir., 217 So.2d 47, 49 cited by the plaintiff-appellant. In the present case, however, our rigid application is used in accord with the jurisprudentially-determined intent of the articles, i. e., to protect a child from being illegitimated at a time when he himself is not in a position to counter evidence which could by default or collusion accomplish this purpose. (In the present hard-fought litigation, of course, there is no slightest suggestion of this; but, the door open, the next children may not be defended by such worthy champions.)